IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF KANSAS

**FILED**

JAN 08 2025

Clerk, U.S. District Court
By: _____ Deputy Clerk

KENNETH MARK HAY, )
    Plaintiff, )
        )
        )
Versus      )  **CASE NO. 5:23-CV-03175-HLT-GEB**
        )
        )
Ms. Keri Applequist, et al., )
    Defendants, )

**Plaintiff's Memorandum of Law supporting his Discovery, Exhibits, Oral Arguments, Trial and Appeal**

  **COMES NOW,** the Plaintiff, Mr. Kenneth Mark Hay, Pro Se, before this Honorable Court to file this Plaintiff's Memorandum of Law supporting his Discovery, Exhibits, Oral Arguments, Trial and Appeal.

The Plaintiff offers the following in support of this Memorandum of Law:

### 1. Plaintiff's Exhibit 1

Harper's Magazine  *January 2025 Issue*  [Letter from Kansas]

The Forever Cure: Is Civil Commitment rehabilitating sex offenders or punishing them?

By Jordan Michael Smith

On Taisa Carvalho Mick's first day as a Psychotherapist with Larned State Hospital's Sexual Predator Treatment Program (SPTP), her co-workers warned her to be careful around her patients. She shouldn't get close to them or believe a word they said, other staffers told her, they were untrustworthy predators, liable to manipulate her – or worse. Mick was surprised. She

didn't hear anything about empathy or treating patients with respect, even though the ostensible goal of the program was to provide therapy.

The handbook provided to those detained at Larned puts it this way, "It is the vision of the SPTP to provide residents with the knowledge and tools needed for their reintegration back into society." For Mick, the residents were simply people in need of care. They had committed crimes, but they had completed their sentences. *"No human being is beyond redemption,"* she told me.

But upon her arrival, Mick found that the SPTP resembled a ***prison*** more than it did a place for therapy. A perimeter of sharp wire ringed the four buildings to which SPTP residents were confined, and security guards roamed the grounds. Residents – almost all of whom were men, though a few identified as nonbinary or transgender – reported substandard medical treatment, terrible food, and little time outdoors. Their telephone calls were monitored, as were their conversations with one another. Outside of a sparse weekly schedule of group therapy sessions, classes, and menial labor at the facility, residents mostly spent their days watching TV or simply sitting around.

At the SPTP, however, Mick discovered that treatment seemed directionless and outdated. Her patients didn't appear to understand what personality disorders even were. They told her that staff members sometimes shamed them, and that when they complained about their confinement or the treatment they received, they were often reprimanded and had their meager privileges revoked. They could be punished for countless minor infractions: swearing, smoking, getting tattoos, sharing food. Unlike in prison, where some over-the-counter medications are available for sale, accessing something like throat lozenges at the SPTP required getting a doctor's order; residents sometimes had to beg for medical attention. Their use of the internet was severely restricted, and they were obliged to disclose their assets, their credit and debit card numbers, and an annual credit report. Those who made more than $127 per month as a Vocational Training Program (VTP) worker were ***required*** to pay **50%** of their earnings to Larned . . . for Room and Board and to pay for their Care, Control and Treatment.

Despite the severity of these measures, however, Mick found that her patients ***rarely*** resembled the monstrous criminals her colleagues had warned her about. Most of her patients seemed relatively harmless, and she never felt unsafe around them. Some had developmental or intellectual disabilities. Many had been there for years, even decades – a number of them were in

there 70's or 80's. They clearly weren't progressing through any genuine treatment program. In fact, Mick believed, some had received improper diagnoses after leaving prison.

She came to believe that the SPTP would never release most of these people, no matter how eagerly they participated and kept up good behavior; her job wasn't to treat these patients, but to perpetuate the illusion of treatment. Whatever the program claimed, Mick grew convinced that it was designed to lock people up ***indefinitely***, not to rehabilitate them.

More recently, a growing body of research has borne out their concerns: as a 2013 *Brooklyn Law Review* article put it, *"SVP laws have had no discernible deterrent or incapacitation effects."*

Rather than spending billions on a "regime that has continued to fail to adequately protect children," a 2023 Johns Hopkins University – led study concluded, states should invest in programs that can better "prevent child sexual abuse in the first place."

Even some who oversee long-established civil-commitment programs have questioned their efficacy. Robin Wilson, the clinical director of Florida's civil-commitment program from 2007 to 2011, believes that treatment should begin at the outset of a prison sentence, not after it has ended, and that most programs start treatment too late to be psychologically helpful.

*"You end up having people who potentially end up going to treatment long after the treatment would have been most effective, and ultimately for much longer and more intensively than their risk profile suggests,"* he told me.

*"There are better, more efficient, more scientifically defensible, more ethical ways to do this."*

In 2014, the research director of Minnesota's Department of Corrections, Grant Duwe, called on states to consider more intermediate, community-based alternatives to civil commitment, such as intensive parole.

But in states where such programs have long existed, few politicians, if any, have shown interest in dismantling them. *"It's become a political third rail,"* Eric Janus, the director of the Sex Offense Litigation and Policy Resource Center at the Mitchell Hamline School of Law, told me. That's not only because of the bad optics of shutting down a program meant to protect the public, he explained, but also because the facilities provide jobs. Larned State Hospital, for instance – where the SPTP is the largest program – is one of the biggest employers in town.

*"You've got a lot of people in the community who are just dependent on those jobs,"* Rick Cagan, the former executive director of the Kansas Chapter of the National Alliance on Mental Illness, told me. *"It's a huge **cash cow**."*

By the time Mick arrived at Larned, critics had long alleged that the SPTP wasn't upholding its obligation to treat patients and prepare them for societal reentry. *"Many residents aren't progressing through the Program's phases on a timely basis,"* noted a report by the Kansas Legislative Division of Post Audit in 2005. *"I don't think the state has been extremely honest about what goes on,"* a former SPTP clinical group leader told the *Lawrence Journal World* that same year. *"I think they're disingenuous in how willing they are to let people go through the program,"* he added. *"That was really one of the things that caused me to leave. I couldn't any longer look at the residents and say, 'Work hard, and you'll get out.'"* Another counselor, who had started working at the SPTP in 2012 and resigned two years later, has described the program as "an abomination". She told a reporter that only a handful of her 90 patients were too dangerous to be released, yet most get stuck in a "vicious cycle", ultimately boycotting treatment out of frustration.

In 2014, 25 SPTP residents filed a lawsuit claiming inadequate treatment. 3 years later, after a resident alleged that the state had failed to conduct an annual review of his case, as required by law, for four of the first 6 years he was detained, the Chief Judge on Kansas's 2nd Highest Court wrote that the Court was *"Deeply **troubled** by the general lack of attention by the District Court to the Periodic Review Component of Due Process."*

Sean Wagner, the SPTP's administrative program director from 2014 to 2017, told me, *"There was a push around this time to make treatment more structured and individualized."* He wanted residents to feel more incentivized to participate in group therapy, for example, and for classes to better target specific needs, such as overcoming addiction. But many staffers resisted or outright refused to implement these initiatives. He attributes this in part to widespread prejudice among the staff: *"I had 237 civilly committed sexual predators, and they were basically a piece of cake compared to the 250 employees I oversaw,"* he told me. 50% of them, he said, *"Believed residents 'ought to be hung up by their nuts on the closest fence post.'"* There were nurses who *"Thought all these guys needed to be shot."*

It wasn't only the employees who felt the residents deserved their confinement. Once, when Wagner decided that several residents were ready for conditional release, word quickly spread through Larned, he said. *"There were a lot of people in the community pissed off that we were even thinking about letting these guys get a job in the community."*

Wagner had many disagreements with how the SPTP was run, and he believed his role there represented an opportunity to make the program more effective and humane. But, he told me, he encountered opposition to making changes at every turn, both from staffers and from his supervisors in the Department of Aging and Disability Services. Finally, in 2017, after several years of butting heads with state officials over his objections to the harshness of SPTP policies, he was reprimanded and reassigned to a different department.

Soon after these incidents, Mick said, she was summoned for a meeting with Brad Base, the president of Sunflower Behavioral Health, a company that contracts with Kansas to provide mental-health staffing to the SPTP. Base told Mick that he had high hopes for her future at the SPTP but, given all the scrutiny the program had been under, he preferred his staff avoid criticizing it. (Base declined to comment for this story).

Eventually, Mick wrote to Base outlining her concerns. She was trying to work with her patients on relapse prevention, she told him, but felt there needed to be more concrete criteria for advancement through the tiers. She went on: *"Some of these guys have been there for so long, and have had so much taken away from them. They get punished for a lot, but on the flip side How can we actually try and motivate them to move forward."*

Base did not reply to Mick directly. His management style, she told me, more often involved sending somewhat coded emails to his entire staff, instructing them on how to approach their work at Larned. Mick felt these messages were sometimes directed at her, *"Some of you are engaging in very helpful activities with your coworkers,"* he wrote in one such email.

***"However, before you go too far down that path, remember who our client is. We serve the State. The State is our client, not the person sitting across from us in sessions. If we are going to be effective in bringing about change to the person sitting across from us in sessions, we must first gain the trust and ability to work effectively with our client, the State."***   - Brad Base to Mick.

The Plaintiff adds that statements like this are the foundations of tyranny.

Mick found most of these to be valid grievances, while the restrictions regarding residents' privileges and behavior seemed unnecessarily punitive and arbitrary. She was particularly disturbed by how the SPTP interfered with personal and romantic relationships. Visits from those outside to approval. Mick recalls one staff meeting that was spent discussing whether a man on tier three – "community reintegration" – should be allowed to be visited by his girlfriend.

The longer Mick worked at the SPTP, the more disillusioned and angry she became. One resident showed her a letter his lawyer had sent him, explaining why his impeccable behavior in treatment was irrelevant to his prospects for release. *"The States [sic] response is that you have been in a controlled environment and they are not willing to risk it in a non controlled environment."* (**Please see Plaintiff's Exhibit 3** which is a letter from Mr. Mark Sevart to Resident Robert Davis, Jr. on April 9, 2022 which states: *"I agree with your position that you have gone along time without any sexually violent act and so it proves that you can control your sexual tendencies. We have tried that argument in other cases. The States response is that you have been in a controlled environment and they are not willing to risk it in a non controlled environment. <u>The only way to leave the program appears to be die.</u>"*

Mick saw this logic as circular: If therapeutic progress and good behavior within the program weren't indicators of readiness for release, what was? In September 2023, she emailed SPTP's administration, explaining that while she respected their depth of experience, she felt she needed to call attention to problems she saw at the facility: *"I see a lot of staff here yelling at residents, being inappropriate, and not conducting themselves professionally, which I do bring attention to despite the backlash I may get . . . As I believe that both staff and residents deserve to be treated as humans I try to model . . . empathy, warmth, as well as strong boundaries with the residents."*

Meanwhile, Base continued to urge his employees to bring complaints directly to Sunflower. *"They are not the State's problems, and anything that makes us look weak to the State hurts us in the long run,"* he wrote. *"As many of you have already seen, the State is not a forgiving environment nor one that is logical. We have to do all we can to protect our name and our people."*

But Mick had little interest in the political picture, and even less in the business side. She wanted to focus entirely on treatment. She found herself becoming increasingly anxious, worrying constantly about her patients and her job. She never knew when she was about to be

reprimanded. She had trouble sleeping, with recurring nightmares of being chased or locked up at Larned herself.

That November, the SPTP had a COVID outbreak. Residents were confined to their units for brief windows of time to shower or use the phone. Concerned for everyone's well being in isolation, Mick planned to deliver their mail to their rooms. But Dr. Christine Mohr, Psy., the SPTP's clinical program director, sent Mick an email instructing her not to enter the units. The N95 face mask Mick was planning to wear had not been approved by the SPTP administration, Dr. Mohr noted – the kind of bureaucratic hang-up that Mick told me frequently hindered work at the facility.

On Wednesday, November 15, 2023, around 7:00 p.m. while checking on a resident in distress, she told me, she heard her name called over the intercom, summoning her to the administrative offices. When she arrived, 3 security guards were waiting. They told her they had orders to escort her from the building. She had been fired, she later learned, for disobeying Dr. Mohr's instructions. They her badge and walked her off the grounds. Mick had lasted five months.

That night, Mick phoned some of her patients to tell them she would not be seeing them anymore. They would have to start treatment anew with different therapists.

*"You need to stop calling units immediately,"* Dr. Mohr told Mick over text message. *"This is unethical and unprofessional."* Mick responded that it was a measure of respect that her patients deserved. *"It is not,"* Dr. Mohr wrote back. *"They're no longer your responsibility. We will address them and handle it."*

Mick believes that people like her former patients deserve an honest chance at rehabilitation, and she will keep fighting for their rights and dignity, no matter how unpopular this cause may be. *"The Kansas Legislature told us in April 2024 that they'd love to see us again at the beginning of this upcoming legislative session,"* she told me. Mick responded with, **"We will be there."**

## 2. Plaintiff's Exhibit 3

ARTICLE: "FRIGHTENING AND HIGH": THE SUPREME COURT'S CRUCIAL MISTAKE ABOUT SEX CRIME STATISTICS, 30 Const. Commentary 495
Copy Citation Fall, 2015     Reporter     30 Const. Commentary 495 *
Length: 5556 words   Author: Ira Mark Ellman* and Tara Ellman**

\* Charles J. Merriam Distinguished Professor of Law, Affiliate Professor of Psychology, Arizona State University; Distinguished Affiliated Scholar, Center for the Study of Law and Society, University of California, Berkeley.
\*\* Consultant, Tempe, Arizona.
It isn't what we don't know that gives us trouble, it's what we know that ain't so. 1Link to the text of the note

In *McKune v. Lile*, 536 U.S. 24, 33 (2002), the Supreme Court reversed two lower courts in rejecting, 5-4, Robert Lile's claim that Kansas violated his *5th Amendment* rights by punishing him for refusing to complete a form detailing all his prior sexual activities, including any that might constitute an uncharged criminal offense for which he could then be prosecuted. The form was part of a prison therapy program that employed a polygraph examination to verify the accuracy and completeness of the sexual history which program participants were required to reveal. Lile had earned placement in a lower-security prison unit, but the automatic punishment imposed on him for declining to complete this form included permanent transfer to a higher security unit where he would live among the most dangerous inmates, and lose significant prison privileges, including the right to earn the minimum wage for his prison work and send his earnings to his family.

Justice Kennedy, justifying this conclusion for the four-person plurality, wrote that the recidivism rate *"of untreated offenders has been estimated to be as high as 80%."* The treatment program, he explained, *"gives inmates a basis ... to identify the traits tha*t cause such a frightening and high risk of [\*496] *recidivism."* The following year in *Smith v. Doe*, 538 U.S. 84 (2003) the Court upheld Alaska's application, to those convicted before its enactment, of a law identifying all sex offenders on a public registry. It reasoned that the ex post facto clause was not violated because registration is not punishment, but merely a civil measure reasonably designed to protect public safety. Now writing for a majority, Justice Kennedy's Smith opinion recalled his earlier language in *McKune*:

Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is "frightening and high." *McKune v. Lile*, 536 U. S. 24, 34 (2002).

This "frightening and high" recidivism rate of "sex offenders" (more on the term "sex offender" later) is a commonly offered justification for the increasingly harsh set of post-release collateral consequences imposed on them, nearly all triggered by their inclusion in sex offender registries. An example is the voters' pamphlet argument for the California initiative known as Jessica's Law, which imposed extraordinary residency restrictions on sex offenders and also required them to wear location-monitoring ankle bracelets for life. These extreme measures were justified, the argument explained, by sex offenders' "very high recidivism rates." 2Link to the text of the note

Residency restrictions like those in Jessica's Law are severe enough to exclude registrants from most available housing in their community, preventing them from living with their families. 3Link to the text of the note Separate "presence restrictions" in many communities bar registrants from using public libraries or enjoying public parks with their families. 4Link to the text of the note Their registration formally excludes them from many jobs, 5Link to the text of the note and as a practical [*497] matter keeps them from many more. The registration requirement typically extends for decades, and in some states, such as California, for life, with no path off the registry for most registrants. Challenges to the registration requirement, and the consequences that flow from it, are usually turned back by courts and politicians who often quote Justice Kennedy's dramatic language describing the recidivism rate for sex offenders as "frightening and high." A Lexis search of legal materials found that phrase in 91 judicial opinions, as well as briefs in 101 cases.

Two examples from state supreme courts give the flavor of these decisions. The Iowa Supreme Court, while expressing sympathy for the "difficulties" that state's residency restrictions created for the *"offender and his family, who lack financial resources,"* 6Link to the text of the note still rejected his constitutional challenge to them because "the risk of recidivism posed by sex offenders is "frightening and high", as "numerous authorities have acknowledged." 7Link to the text of the note Despite this reference to "numerous authorities," only Justice Kennedy's language in *Smith* was cited. A Kansas law mandating lifetime post-release supervision of all sex offenders applied to a 25-year old man convicted of consensual intercourse with a fifteen year old girl who testified she had "encouraged" his behavior. 8Link to the text of the note A Corrections Department psychologist testified that he had accepted responsibility for his actions, displayed an *"appropriate level of remorse,"* and was at low risk to re-offend. 9Link to the text

of the note The Kansas Supreme Court nonetheless rejected his challenge to the statutes' mandated lifetime supervision, citing Smith, and explaining the legislature could reasonably have *"grave concerns over the high rate of recidivism among convicted sex offenders"* whose risk of recidivism "is frightening and high." 10Link to the text of the note

Given the impact of the language in Smith and McKune, it seems important to know whether it's true-whether those convicted of sex offenses indeed re-offend at an 80% rate that is both "frightening and high," and much greater than the rate for other offenders.

*McKune* provides a single citation to support its statement *"that the recidivism rate of untreated offenders has been estimated to be as high as 80%":* the U.S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988). Justice Kennedy likely found that reference in the amicus [*498] brief supporting Kansas filed by the Solicitor General, then Ted Olson, as the SG's brief also cites it for the claim that sex offenders have this astonishingly high recidivism rate. This Practitioner's Guide 11Link to the text of the note itself provides but one source for the claim, **an article published in 1986 in Psychology Today, a mass market magazine aimed at a lay audience**. 12Link to the text of the note That article has this sentence: *"Most untreated sex offenders released from prison go on to commit more offenses - indeed, as many as 80% do."* 13Link to the text of the note But the sentence is a bare assertion: the article contains no supporting reference for it. Nor does its author appear to have the scientific credentials that would qualify him to testify at trial as an expert on recidivism. 14Link to the text of the note He is a counselor, not a scholar of sex crimes or re-offense rates, and the cited article is not about recidivism statistics. It's about a counseling program for sex offenders he then ran in an Oregon prison. His unsupported assertion about the recidivism rate for untreated sex offenders was offered to contrast with his equally unsupported assertion about the lower recidivism rate for those who complete his program.

[*499] So the evidence for McKune's claim that offenders have high re-offense rates (and the effectiveness of counseling programs in reducing it) was just the unsupported assertion of someone without research expertise who made his living selling such counseling programs to prisons. 15Link to the text of the note

The Solicitor General's brief in Smith is also the likely source of a second influential phrase about sex offenders. The brief frames the question before the Court with this opening statement:

Sex offenders exact a uniquely severe and unremitting toll on the Nation and its citizens for three basic reasons: *"they are the least likely to be cured"; "they are the most likely to reoffend"; and "they prey on the most innocent members of our society."* United States Dep't of Justice, Bureau of Justice Statistics (BJS), National Conf. on Sex Offender Registries (National Conf.) 93 (Apr. 1998).

The *Smith* opinion did not quote this language, but others have. One example is the preamble to California's Jessica's Law, which attributes the quoted language to an otherwise unidentified "1998 report by the U.S. Department of Justice." 16Link to the text of the note The California Supreme Court's citation attributed the same language to *"a report by the United States Department of Justice."* 17Link to the text of the note The language has also [*500] appeared in several local ordinances in the Midwest. 18Link to the text of the note Yet the statement is rather odd. **What does it mean to say that sex offenders are "the least likely to be cured?" Least likely to be cured of what? Of the inclination to commit sex offenses? In that case, who's more likely to be cured? People who don't have that inclination in the first place? It's hard to imagine any scientist making such an incoherent statement, and a search for the referenced "Justice Department Report" reveals that none did. The "report" is merely a collection of speeches given at a 1998 conference of advocates for sex offender registries.** The collection's cover sheet disavows any Justice Department endorsement of its contents. 19Link to the text of the note The "least likely" phrase is taken from a speech in this collection given by a politician from Plano, Texas, **who never claimed any scientific basis for it. Indeed, she did not even claim it was true.** What she actually said was that it is a statement she likes to make. 20Link to the text of the note The Solicitor General's representation of this statement as a Justice Department conclusion about the nature of sex offenders was at best irresponsible.

So what is the re-offense rate for those convicted of a sex offense? One cannot calculate it without first defining "re-offense*," without specifying the time period to employ, and without considering whether one needs to distinguish among different groups of offenders said to have committed a "sex offense."* We consider these points in turn.

The right definition of re-offense depends on what we want to know: is it the proportion of released offenders who commit a crime of any kind, or a serious crime of any kind, or a sex crime (of any degree)? If the purpose of the sex offender registry the Court addressed in Smith

[*501] is to aid the police in investigating sex offenses, or warn the public about persons thought likely to commit them, then we want to know the rate at which those convicted of a sex offense commit another one. That's quite different than the rate at which they commit any act that returns them to prison. The California Corrections Department recently examined cases of sex offender registrants who are returned to prison, **and found that in 92% of the cases the reason was a parole violation**, which is generally something that is not a crime for anyone who is not on parole - things like going to a bar or visiting a friend who's also an ex-felon. Less than 1% of those re-incarcerated had committed a new sex offense. 21Link to the text of the note

The time period we ask about of course also matters: As one lengthens the follow-up period, one would expect to find more re-offenses. So the most cautious measure would ask whether an offender ever commits another sex offense. But answering that question would require following offenders until their death. Of course, a study limited to deceased offenders would necessarily exclude most released in recent decades. Long-term follow-up studies are available, however, and a recent meta-analysis by a leading scholar in the area, Karl Hanson, combines the data from 21 studies that followed offenders for an average of 8.2 years, and for as long as 31. 22Link to the text of the note Nearly **8,000 offenders were followed**, overall. The use of a meta-analysis to combine the data from all these long-term studies provides more confident projections of long-term re-offense rates. Sixteen of the 21 studies were done on offenders in other western countries (most often, Canada) where sentences are typically shorter than in the U.S., and released offenders are not subject to American-style offender registries. 23Link to the text of the note The 21 studies included in this meta-analysis examined different populations of offenders; one might expect the modal offender in some studies to present a higher risk of re-offense than the modal offender in others. [*502] But having such a variety of offenders is another advantage. The authors were able to assess offender risk levels using a well-established actuarial measure, 24Link to the text of the note the Static 99-R, 25Link to the text of the note to classify each of the individual offenders in all 21 studies as low, medium, or high risk.

Consider first the high-risk offenders in this study. Nearly 20% of them committed 26Link to the text of the note a **new sex offense within five years of release, and 32% (an additional 12%) did so within 15 years**. But high-risk offenders who hadn't committed a new sex offense within fifteen years of their release rarely did later. Indeed, none of the high-risk

offenders who were offense-free after 16 years committed a sex offense thereafter. 27Link to the text of the note This point is important because most people are typically put on registries for decades, and often for life. Being offense-free for twenty years, or more, will not get them removed even though this history tells us the chance of their committing a new offense is very small. Some context can help here. **One recent study found that about 3% of felons with no known history of sex offenses commit one within [*503] 4.5 years of their release.** 28Link to the text of the note Of course, they are not on the sex offender registry during their release period, even though the chance of their committing a sex offense is higher than the chance of a new sex offense by a high-risk sex offender who has been offense-free for fifteen years.

Indeed, it's mistaken to think of anyone who's been offense-free for fifteen years as high-risk. At the time of their release we cannot tell which high-risk offenders will be among the two-thirds who won't re-offend, but that is revealed over time. Those who haven't re-offended after fifteen years are not high-risk for doing so, regardless of their offense or their initial risk assessment. 29Link to the text of the note One cannot accurately assess an individual's risk of committing an offense in the future if one ignores what they have done - and not done - for the last fifteen, twenty, or [*504] twenty-five years in the past. Yet that is exactly what sex offender registries do for large groups of people listed on them.

And what about those who were not classified high-risk in the first place? **About 97.5% of the low-risk offenders were offense-free after five years; about 95% were still offense-free after 15 years.** 30Link to the text of the note Thus, a simple actuarial test identifies a large group of sex offenders whom we know are, from the outset, less likely to commit a sex offense after release than are released felons with no sex offense history (who of course are not on the registry). What about the chance of a sex offender committing some other serious crime? Other studies find that released sex offenders are less likely to commit a new felony of any kind, after release, than are other released felons. 31Link to the text of the note

People may assume that most registrants committed violent rapes or molested children, but they would be wrong. State laws require registration of a teenager who had consensual sex with another teenager, of people who possessed erotic images of anyone under 18 but had no history of any contact offense, and even, depending on the state, someone convicted of public urination. 32Link to the text of the note A Justice Department study concluded that more than a quarter of all sex offenders committed their offense when they were themselves a minor. 33Link

to the text of the note If the registry's main purpose is to let us monitor and warn people about those who committed violent, coercive, or exploitative contact sex offenses, we dilute its potential usefulness when we fill it up with people who never did any of those things.

Or, people who once did but are very unlikely to do so again because it's been many years since they committed any crime. The respondents in Smith who challenged the Alaska registry were classified as "aggravated" sex offenders, required under Alaska law to register four times a year for life, because they had been pled nolo [*505] contendere in 1984 to sexual contact with minors. 34Link to the text of the note They served their sentences and were released in 1990. One had completed a two-year post-release treatment program. The other had remarried after release and been granted custody of his daughter, the court having concluded he had been rehabilitated. (Psychiatric evaluations found he had "a very low risk of re-offending" and was "not a pedophile.") Neither had re-offended in the twelve years since release, a fact that alone predicts a re-offense rate below 5%. 35Link to the text of the note Alaska posts the address and place of employment of all registrants for public viewing in print or electronic form, so that it can be used by "any person" and "for any purpose." 36Link to the text of the note Alaska's registry rules are milder than some. California's and Florida's registries, for example, make no distinction among sex offenses; lifetime registration is required for all. A 14-year old in Florida who had consensual intimate contact with his 13-year old girlfriend would have to register for life. 37Link to the text of the note

The Pennsylvania Supreme Court has recently held that treating everyone convicted of a sex offense as a likely re-offender, when many are not, violates the constitutional guarantees of Due Process. In J.B. 38Link to the text of the note it considered changes to the Pennsylvania registry law that automatically placed juveniles on the offender registry for 25 years if they committed a rape or "aggravated indecent assault" when over 14. 39Link to the text of the note The rationale for the registry law was the legislative finding that "Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." The court objected that the affected juveniles were effectively subject to an "irrebuttable presumption" that they posed a high risk of re-offense even though the presumption is in fact "not universally true."

The effect of registration was one key to the court's holding that this misclassification has constitutional significance. The plaintiffs had argued that registration "impedes a child's pathway to a normal productive life through continuously reinforcing the unlikely supposition that the youth has "a high risk of committing additional sexual offenses,'" creating "difficulty obtaining housing, employment, [*506] and schooling" as well as "depression." 40Link to the text of the note Imposing these burdens on the plaintiffs unconstitutionally denied them Due Process, the court concluded, because individual offenders were allowed no meaningful opportunity to show the presumption of high risk was factually wrong in their case. Because good individualized measures of the likelihood of re-offending are available, the state has no need to employ, and thus endorse, global stereotypes that registered sex offenders are particularly dangerous, when these stereotypes have no basis in fact. Registration requirements "premised upon the presumption that all sexual offenders pose a high risk of recidivating … impinge upon juvenile offenders' fundamental right to reputation as protected under the Pennsylvania Constitution." 41Link to the text of the note

The California Supreme Court used different labels but a similar logic when it held this year that it was unconstitutionally irrational to automatically subject every sex offender parolee in San Diego County to residency restrictions that impeded their rehabilitation and left many of them with no place to live. 42Link to the text of the note Once again, the problem with the statute was its application to every sex offender, without regard to their individual circumstances including an individualized assessment of each offender's risk of re-offense. The court noted that parole officers have general supervisory authority over parolees that allows them to impose restrictions on their residence that are reasonably related to the particular parolee's situation. So the court allowed customized restrictions logically connected to the individual offender's situation, but not "one size fits all" restrictions imposed on all offenders.

The logic of these decisions offers hope for a wider judicial rationalization of the rules on sex offender registries and the life restrictions that typically accompany them. To realize that hope, one must apply the principle common to the Pennsylvania and California decisions to a correct understanding of the facts. The principle is that concerns about public safety cannot justify policies that impose serious burdens on entire categories of individuals when many of them actually present little risk, at least when more accurate assessment criteria employing established actuarial measures, and the simple passage of time, could easily be employed instead.

The burdens imposed by registration and all the consequences that follows from it demand [*507] justifications grounded on more nuanced risk assessments than those the registration laws currently employ. The simple fact is that the risk level, for nearly everyone on the registry, is nowhere near the "frightening and high" rate assumed by Smith and McKune and all the later decisions that rely on them.

But while the principles endorsed by these recent opinions offer hope, the Pennsylvania opinion also illustrates the difficulty of getting courts to understand the facts well enough to apply them properly. The court held that the burdens of registration on juveniles could not be justified because of their lower re-offense rate: *"While adult sexual offenders have a high likelihood of reoffense, juvenile sexual offenders exhibit low levels of recidivism (between 2-7%), which are indistinguishable from the recidivism rates for non-sexual juvenile offenders, who are not subject to SORNA registration."* 43Link to the text of the note But one can see that the court's comparison was infected by the very same error it condemned when it compares juveniles to all adults, making no distinction among adult registrants. The Hanson study finds the re-offense rate for low and moderate-risk offenders, who probably account for most adults on the registry, is within the same 2-7% range the court attributes to juveniles. 44Link to the text of the note And of course, the re-offense rate then declines, for all registrants, with each year after release that they remain offense-free. **Any state that routinely imposes 25-year registration requirements on adult offenders has a registry full of people who have gone ten or more years with no new offense, for whom the average likelihood of re-offense is well below 7%. The problem is worse in states like California and Florida that put all offenders on the registry for life.**

Writing on a different subject entirely, Eula Biss recently observed:

*"Risk perception may not be about quantifiable risk so much as it is about immeasurable fear. Our fears are informed by history and economics, by social power and stigma, by myth and nightmares. And as with other strongly held beliefs, our* [*508] *fears are dear to us. When we encounter information that contradicts our beliefs, we tend to doubt the information, not ourselves.* 45Link to the text of the note. *The label "sex offender" triggers fear, and disgust as well. Both responses breed beliefs that do not yield easily to facts. That's why even those politicians now urging criminal justice reforms conspicuously omit mentioning sex offenses when they argue for less punitive policies that would facilitate the offenders' reintegration into civil society.* 46Link to the text of the note *Unfortunately, the Supreme Court has fed the fear. It's*

*become the "go to" source that courts and politicians rely upon for "facts" about sex offender recidivism rates that aren't true. Its endorsement has transformed random opinions by self-interested nonexperts into definitive studies offered to justify law and policy, while real studies by real scientists go unnoticed. The Court's casual approach to the facts of sex offender re-offense rates is far more frightening than the rates themselves, and it's high time for correction. Perhaps there's now hope it may soon happen."*

3. Your Honor, these 3 Exhibits demonstrate that the Kansas Sexually Violent Predator Act and the Kansas Sexual Predator Treatment Program is Unconstitutional, Punitive, Shocking to the Conscious, Intolerable Conduct, Egregious and lacking in Due Process because:
   a. The Legislative Intent of the Kansas Legislature has **always** been Continued Punishment and not care, therapy, rehabilitation or treatment.
      i. The Kansas Legislature refuses to correct their error that is 30 years old and therefore Your Honor it is up to this Honorable Court to take the Facts, Truth, Arguments, Authorities, Case Law and Exhibits and rule that the Act be Repealed and the Program be shutdown for said reasons.
   b. The Conditions of Confinement are not Equal to or Greater than the Plaintiff's Criminal Counterparts, and that includes pre-trial detention in the County of Conviction Jail.
      i. The Conditions of Confinement in the Act and the Program are Unconstitutional, Punitive, Shocking to the Conscious, Intolerable Conduct, and Egregious.
   c. There is no Care, Therapy, Rehabilitation and Treatment in the Act and the Program.
      i. This makes the Act and the Program Unconstitutional, Punitive, Shocking to the Conscious, Intolerable Conduct, and Egregious.
   d. The Act and the Program lacks Due Process and therefore is Unconstitutional, Punitive, Shocking to the Conscious, Intolerable Conduct, and Egregious.

4. The Act and the Program is based on a lie perpetuated by an amateur that was selling his "treatment program" to Department of Corrections' and the States so that he could make a fortune off of the fears of them and the public by stating that *"Untreated offenders recidivate as high as 80%"*
   a. His actions and behavior are no different or better than a corrupt car salesman and his message the same as that of a sleezy carnival trickster.
   b. As the Plaintiff has clearly proven this Cognitive Distortion about Sex Offenders has perpetuated a Scarlett Letter for almost 39 years and has caused unjust persecution for the Plaintiff and those similarly situated as that of a Jew in Nazi Germany.
5. By Mr. Base stating that the State is the Program's client and not the Plaintiff or those similarly situated with him, this proves that the Act and the Program are Unconstitutional, Punitive, Shocking to the Conscious, Intolerable Conduct, and Egregious.
   a. Statements like this is why our Founding Fathers rebelled against King George and became the Sons of Liberty and eventually won their Independence and formed these Great and Wonderful United States of America.
6. *McKune v. Lile* clearly and transparently, like crystal, displays to this Honorable Court that the SOTP that is operating and functioning in the Kansas Department of Corrections is a Failure, **needs** revamped as the Plaintiff humbly requested in his Final Prayer for Relief, and is **currently** Making Predators out of the men in their tutelage because the State is their client and not the patient.
   a. Your Honor, the slogan of the KDOC is: *"A safer Kansas through safer corrections."* **The Act and the Program's slogan and mission is no different because their client is the State and not the patient.**
      i. This is why the Act and the Program is Unconstitutional, Punitive, Shocking to the Conscious, Intolerable Conduct, and Egregious.

**THEREFORE,** the Plaintiff humbly request that this Honorable Court enters judgment in his favor granting this Memorandum of Law supporting his Discovery, Exhibits, Oral Arguments, Trial and Appeal.

## CERTIFICATE OF SERVICE

I, <u>KENNETH HAY,</u> hereby certify that a True and Correct Copy of this Memorandum of Law was sent, by U.S. Mail, postage prepaid, on this _____ day of the month of _____ of the year _____ to the following parties in this case:

Kansas Attorney General's Office
**C/O Mr. Matthew Shoger**
120 S.W. 10th Street, 2nd Floor
Topeka, Kansas 66612

United States District Courthouse
**C/O Clerk of the District Court**
444 S.E. Quincy
490 U.S. Courthouse
Topeka, Kansas 66683

Respectfully Submitted,

_____
Mr. Kenneth Mark Hay
1301 Kansas Highway 264
Larned, Kansas 67550
620-285-4660 extension 4